1  William B. Federman* (Oklahoma S.B. # 2853)
   **FEDERMAN & SHERWOOD**
2  10205 N. Pennsylvania Ave.
   Oklahoma City, OK 73120
3  Telephone:  (405) 235-1560
   Facsimile:(405) 239-2112
4  *Admitted Pro Hac Vice

5  Lead Counsel

6  Bibianne U. Fell (S.B. # 234194)
   **FELL LAW, P.C.**
7  402 W. Broadway, Suite 950
   San Diego, CA 92101
8  Telephone:  (858) 201-3960
   Facsimile:(858) 201-3966

9
   Scott Edward Cole, Esq. (S.B. #160744)
10 Cody Alexander Bolce, Esq. (S.B. #322725)
   **COLE & VAN NOTE**
11 555 12th Street, Suite 1725
   Oakland, California 94607
12 Telephone:  (510) 891-9800
   Facsimile:(510) 891-7030

13
   Joel E. Elkins (S.B. # 256020)
14 **WEISSLAW LLP**
   9100 Wilshire Blvd. #725 E.
15 Beverly Hills, CA 90210
   Telephone:  (310) 208-2800
16 Facsimile:(310) 209-2348

17              **UNITED STATES DISTRICT COURT**

18            **SOUTHERN DISTRICT OF CALIFORNIA**

19 *In re: Scripps Health Data Breach*      **CASE  NO.:   3:21-CV-01135-GPC-**
   *Litigation*                            **MSB**
20
                                           **CLASS ACTION**
21
                                           **PLAINTIFFS' CONSOLIDATED**
22                                         **COMPLAINT FOR DAMAGES**
                                           **RESTITUTION AND**
23                                         **INJUNCTIVE/EQUITABLE**
                                           **RELIEF**
24
                                           **JURY TRIAL DEMANDED**
25

26

27

28

## I.   INTRODUCTION

1.     Plaintiffs, Michael Rubenstein ("Plaintiff Rubenstein"), Richard Machado ("Plaintiff Machado"), James Garren ("Plaintiff Garren"), and Kate Rasmuzzen ("Plaintiff Rasmuzzen") (collectively, the "Representative Plaintiffs") bring this class action against Defendant Scripps Health ("Defendant" or "Scripps") on behalf of themselves, all others similarly situated, and on behalf of the general public, for Defendant's failure to properly secure and safeguard Representative Plaintiffs' and Class Members' personally identifiable information stored within Defendant's information network, including, without limitation, their names, dates of birth, Social Security numbers and/or driver license numbers (these types of information, *inter alia*, being hereafter referred to, collectively, as "personally identifiable information" or "PII")[1] and to properly secure and safeguard Representative Plaintiffs' and Class Members' personal health information stored within Defendant's information network, including, without limitation, their health insurance information, medical record numbers, patient account numbers, and/or clinical information such as physician(s) name, date(s) of service, doctor progress notes, lab test results, and/or treatment information (these types of information, *inter alia*, being hereafter referred to, collectively, as "personal health information" or "PHI")[2]

2.     With this action, Representative Plaintiffs seek to hold Defendant responsible for the harms it caused Representative Plaintiffs and the over one

---

[1]   Personally identifiable information generally incorporates information that can be used to  distinguish or trace an individual's identity, either alone or when combined with other personal or  identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its  face expressly identifies an individual. PII also is generally defined to include certain identifiers  that do not on their face name an individual, but that are considered to be particularly sensitive  and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers).

[2]   Personal health information ("PHI") is a category of information that refers to an individual's medical records and history, which is protected under the Health Insurance Portability and Accountability Act (HIPAA). Inter alia, PHI includes test results, procedure descriptions, diagnoses, personal or family medical histories and data points applied to a set of demographic information for a particular patient.

hundred forty-seven thousand (147,000) other similarly situated persons in the massive and preventable ransomware attack that took place on or around April 29, 2021, by which cybercriminals infiltrated Defendant's inadequately protected network servers where highly sensitive personal and medical information was being kept unprotected ("Data Breach" or "Breach").[3]

3.     Through the use of malware, unauthorized persons infiltrated Defendant's network servers which housed its members' sensitive PII that included names, addresses, dates of birth, health insurance information, medical record numbers, patient account numbers, clinical and treatment information, as well as social security numbers and drivers' license numbers.

4.     This PII/PHI was compromised due to Defendant's negligent, grossly negligent, and/or reckless acts and omissions and the failure to protect PII/PHI of Representative Plaintiffs and Class Members.

5.     Due to Defendant's negligence, gross negligence, and/or recklessness and data security failures, cybercriminals obtained and now possess everything they need to commit personal and medical identity theft and wreak havoc on the financial and personal lives of hundreds of thousands of individuals for decades to come.

6.     The exposed PII/PHI of Representative Plaintiffs and Class Members can be sold on the dark web. Hackers can access and then offer for sale the unencrypted, unredacted PII/PHI to criminals. Given Defendant's misconduct in allowing hackers to access such information in this instance, Representative Plaintiffs and Class Members face a lifetime risk of identity theft, which is heightened here by the loss of Social Security numbers.

7.     As a result of the Data Breach, Representative Plaintiffs and Class Members have already suffered damages. For example, now that their PII/PHI been

---

[3]  *See* https://www.hipaajournal.com/147000-patients-affected-by-scripps-health-ransomware-attack/#:~:text=Scripps%20Health%2C%20the%20second%20largest,May%201%2C%202021%20ransomware%20attack (last accessed July 28, 2021).

released into the criminal cyber domains, Representative Plaintiffs and Class Members are at imminent and impending risk of identity theft. This risk will continue for the rest of their lives. Additionally, Representative Plaintiffs and Class Members have already lost time and money responding to and mitigating the impact of the Data Breach, which efforts are continuous and ongoing.

8.     As San Diego, California's second largest healthcare provider, Defendant acquired, collected and stored Representative Plaintiffs' and Class Members' PII/PHI in order to ensure efficient and quality healthcare to its patients. Therefore, at all relevant times, Defendant knew or should have known that its patients would use Scripps Health to store and/or share sensitive data, including highly confidential PII/PHI, because Defendant promised them that creating personal healthcare records would improve health care quality.

9.     The HIPAA Privacy Rule (45 CFR, Parts 160 and 164(A) and (E), among other sections, hereinafter "HIPAA") establishes national minimum standards for the protection of individuals' medical records and other personal health information. HIPAA, generally, applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically, and sets minimum standards for Defendant's maintenance of Representative Plaintiffs' and Class Members' personal and medical information. More specifically, HIPAA requires appropriate safeguards be maintained by healthcare providers such as Defendant to protect the privacy of personal health information and sets limits and conditions on the uses and disclosures that may be made of such information without patient authorization. HIPAA also establishes a series of patients' rights over their health information, including rights to examine and obtain copies of their health records, and to request corrections thereto.

10.     Additionally, the HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The HIPAA Security Rule

requires appropriate administrative, physical and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.

11.    By obtaining, collecting, using, and deriving a benefit from Representative Plaintiffs' and Class Members' PII/PHI, Defendant assumed legal and equitable duties to those individuals. These duties arise from HIPAA and other state and federal statutes and regulations as well as common law principles.

12.    Defendant disregarded the rights of Representative Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Representative Plaintiffs' and Class Members' PII/PHI was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII/PHI of Representative Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party—an undoubtedly nefarious third party that seeks to profit off this disclosure by defrauding Representative Plaintiffs and Class Members in the future. Representative Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

## II.    JURISDICTION AND VENUE

13.    Jurisdiction is proper in this Court under 28 U.S.C. §1332 (diversity jurisdiction) and/or 28 U.S.C. §1331 (controversy arising under United States law). Specifically, this Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one other Class Member is a citizen of a state different from Defendant as Defendant treats patients

who are citizens of other states who come to its facilities for medical care and from whom Defendant has collected PII/PHI.

14.   Supplemental jurisdiction to adjudicate issues pertaining to California state law is proper in this Court under 28 U.S.C. §1367.

15.   Defendant routinely conducts business in California, has sufficient minimum contacts in California and has intentionally availed itself of this jurisdiction by marketing and selling products and services, and by accepting and processing payments for those products and services within California.

16.   Venue is proper in this Court under 28 U.S.C. § 1391 because the events that gave rise to Representative Plaintiffs' claims took place within the Southern District of California, and Defendant does business in and is headquartered in this Judicial District.

## III.   THE PARTIES

### *Plaintiff Michael Rubenstein*

17.   Representative Plaintiff Michael Rubenstein ("Rubenstein") is an adult individual and, at all relevant times herein, a resident of the State of California. Rubenstein is a victim of the Data Breach.

18.   Rubenstein was a patient of, and received medical services from, Scripps.

19.   At all times herein relevant, Rubenstein is and was a member of the Nationwide Class and the California Subclass.

20.   As required in order to obtain medical services from Scripps, Rubenstein provided Scripps with highly sensitive personal, financial, health, and insurance information.

21.   Rubenstein's PII/PHI was exposed in the Data Breach because Scripps Health stored and/or shared Rubenstein's PII/PHI. His PII/PHI was within the possession and control of Defendant at the time of the Data Breach.

22.     Rubenstein manages a chronic health condition, as further detailed below and, because of this, uses Defendant's online patient portal and Epic Electronic Medical Record system nearly every day to manage his care. On or around April 30, 2021, Rubenstein learned of the Data Breach. Initially, he tried to log onto Defendant's online patient portal and Epic Electronic Medical Record ("EMR") system and found it nonfunctional and inaccessible.

23.     When Rubenstein discovered these systems were inaccessible, he investigated by calling several of his Scripps Health doctors' offices; eventually, he was able to gain some information from a nurse on or around May 1, 2021. It was this nurse who finally told him there had been a "cyber-attack" on Defendant's online network. Rubenstein then began conducting research online and via various news sources, at which point he discovered more specific details about the Data Breach.

24.     As Rubenstein began to glean details of the Data Breach, he telephoned the administration line of Defendant's Chief Executive Officer ("CEO"). Despite multiple telephone calls of this nature during the first week of May 2021, including leaving several voicemail messages, no one ever called him back.

25.     Rubenstein has been diagnosed with Primary Polycythemia (or polycythemia vera), also called Myelofibrosis due to his progressed condition. This blood disorder results in Rubenstein having a higher red blood cell count than the average person. While this condition is incurable, many of the condition's effects can be managed through medication. Rubenstein is currently disabled and collects disability through social security, his previous employer and his own medical coverage. Due to Rubenstein's chronic condition, he manages his healthcare through Defendant's patient portal and Epic EMR.

26.     Because of Rubenstein's condition, he must constantly monitor his disease state through the lab results accessible through Defendant's patient portal and Epic EMR in order to determine the proper administration of his ongoing

prescribed medications. However, as a result of the Data Breach, both the past lab results and future lab orders that Rubenstein had through July 2021 were inaccessible to him. Additionally, there were no alternative or backup systems in place for Rubenstein to access his laboratory information since all of Defendant's lab results and lab orders are electronically stored and accessible.

27.     During the system outage caused by the Data Breach, Rubenstein attempted to call his doctors but did not receive any answers or responses to his voicemails. Rubenstein then visited, in person, his hematologist's office, but his doctors were unavailable. Finally, Rubenstein was forced to visit a Scripps Health hematology clinic and beg a nurse to provide for him his lab orders.

28.     As a result, as of May 2021, Rubenstein's only option was to take his medication without specific knowledge of his laboratory results. This was potentially dangerous to Rubenstein as he was unable to confirm whether the timing/administration of particular dosages was correct.

29.     Additionally, Rubenstein attempted to receive medical advice from hematologists outside of Defendant's healthcare system. Rubenstein was unsuccessful in these efforts insofar as these independent hematologists would not see him without the notes from a prior hematologist—notes that were inaccessible to Rubenstein as a result of the Data Breach—or would have to re-diagnose all or portions of Rubenstein's condition through procedures that would have been time consuming and invasive.

30.     Furthermore, Rubenstein altogether missed a regularly scheduled bone marrow biopsy in May 2021 due to the Data Breach and its resultant online network failure. Rubenstein receives a bone marrow biopsy every four to five years in order to accurately assess his current health condition. Reviewing the results of these biopsies is critical for his doctors to determine and advise in favor or against different treatment options. Similar to his reactions to the other events described above,

Rubenstein experienced emotional distress in the form of anxiety and lost sleep due to missing this critical appointment.

***Plaintiff Richard Machado***

31.     Representative Plaintiff Richard Machado ("Machado") is an adult individual and, at all relevant times herein, resident of the State of California. Machado is a victim of the Data Breach.

32.     Machado was a patient of, and received medical services from, Scripps.

33.     At all times herein relevant, Machado is and was a member of the Nationwide Class and the California Subclass.

34.     As required in order to obtain medical services from Scripps, Machado provided Scripps with highly sensitive personal, financial, health, and insurance information

35.     Machado's PII/PHI was exposed in the Data Breach because Defendant Scripps Health stores and/or shared Machado's PII/PHI. His PII/PHI was within the possession and control of Defendant at the time of the Data Breach.

36.     On or around June 1, 2021, Machado learned of the Data Breach. Because Machado was no longer an active patient of Scripps Health at the time of the Data Breach, he was not aware that Defendant's patient portal was inoperable or that the Data Breach had occurred until he received a letter in the mail from Defendant that, at least summarily, described the unauthorized access of the Scripps Health network and the information that was compromised. Again, this was more than a month after Defendant's network was unlawfully accessed.

37.     Machado was diagnosed with Type 2 Diabetes while a patient of Scripps Health several years ago. As a further result of his condition, Machado underwent a very personal surgery that was extremely painful and private for him. Records exist within Scripps Health's data network and/or ancillary systems regarding these procedures and are highly personal to Machado.

38.     Machado was aware that Scripps Health still had his personal medical history and diagnoses on file in its Epic Electronic Medical Record and/or ancillary systems, and he trusted Defendant to safeguard his private information.

39.     Because Machado underwent extensive treatment for his Type 2 Diabetes while a patient of Scripps Health, his potential private information compromised is vast.

***Plaintiff James Garren***

40.     Plaintiff James Garren ("Garren") is a is an adult individual and, at all relevant times herein, a resident of the State of California. Garren is a victim of the data breach.

41.     At all times herein relevant, Garren is and was a member of the Nationwide Class and the California Subclass.

42.     Garren was a patient of, and received medical services from, Scripps.

43.     As required in order to obtain medical services from Scripps, Garren provided Scripps with highly sensitive personal, financial, health, and insurance information.

44.     Garren's PII/PHI was exposed in the Data Breach because Defendant Scripps Health stores and/or shared Garren's PII/PHI. His PII/PHI was within the possession and control of Defendant at the time of the Data Breach.

45.     Mr. Garren first became a patient of, and received medical services from, Scripps in or around January 2021.

46.     On or around April 5, 2021, Garren received a statement for services rendered at Scripps Memorial Hospital Encinitas. However, Garren never received such services but has received a co-pay request with the statement.

47.     Garren received a letter from Scripps dated on or around June 1, 2021, informing him that his PII/PHI was involved in the Data Breach.

///

///

*Plaintiff Kate Rasmuzzen*

48.   Plaintiff Kate Rasmuzzen ("Rasmuzzen") is an individual and, at all relevant times herein, a resident of the State of California. She is a victim of the Data Breach.

49.   Rasmuzzen was a patient of, and received medical services from, Scripps.

50.   At all times herein relevant, Rasmuzzen is and was a member of the Nationwide Class and the California Subclass.

51.   As required in order to obtain medical services from Scripps, Rasmuzzen provided Scripps with highly sensitive personal, financial, health, and insurance information.

52.   Rasmuzzen's PII/PHI was exposed in the Data Breach because Defendant Scripps Health stores and/or shared Rasmuzzen's PII/PHI. Her PII/PHI was within the possession and control of Defendant at the time of the Data Breach.

*Defendant Scripps Health*

53.   Defendant, Scripps Health, is a California corporation with its principal place of business located at 10140 Campus Point Drive, San Diego, California 92121.

54.   Defendant is the second largest healthcare provider in San Diego and is a "$3.1 billion not-for-profit health care organization whose legacy spans decades for one shining reason – excellence."[4]

55.   Originally founded in 1924 by Ellen Browning Scripps as a philanthropic project, Defendant's private, nonprofit health system now includes four hospitals on five campuses along with 28 outpatient facilities and clinics.[5] Defendant treats 700,000 patients annually through more than 3,000 affiliated

---

[4] *See* https://www.scripps.org/about-us (last accessed July 28, 2021).
[5] https://www.scripps.org/about-us/who-we-are. (last accessed July 28, 2021).

physicians and offers clinical research and medical education programs, presented by well over 15,000 employees and volunteers.[6]

56.    Defendant routinely collects patients' PII "to provide [them] with quality care and to comply with certain legal requirements."[7] Defendant expressly represented it "takes great care to ensure [their] health information is kept private and secure,"[8] and understood doing so is a "requirement of State and Federal law..."[9]

57.    Defendant breached its duty to safeguard and protect from unauthorized persons the PII/PHI of Representative Plaintiffs, Class Members, and all other Scripps patients by failing to adequately and sufficiently prevent the Breach on its systems that compromised the personal sensitive information of all of its members.

58.    Defendant's failure to protect Representative Plaintiffs' and Class Members' data was not for lack of resources. In its fiscal year ending in September 2019, Defendant reported total revenue of $3,345,481,577 and net revenue less expenses of $274,752,677, with $113,859,866 in investment income alone.[10] In that same fiscal year, Defendant reported net assets of 4,250,272,456.[11]

59.    What's more, the scope and sophistication of Defendant's operation is further reflected in the large salaries of its executives. In fiscal year ending in September 2019, Defendant paid President Christopher Van Gorder over $1.9 million, down from a staggering $8.6 million it paid him the prior year.[12] Other

---

[6]    *Id.*
[7]    https://www.scripps.org/sparkle-assets/documents/100-8560-217sw-english.pdf (last visited July 28, 2021).
[8]    https://www.scripps.org/patients-and-visitors/medical-records (last visited July 28, 2021).
[9]    https://www.scrippshealthplanservices.com/sparkle-assets/documents/provider-operations-manual-effective-06-01-2019.pdf? (last visited on July 28, 2021).
[10]    2018 990 Form available at https://projects.propublica.org/nonprofits/organizations/951684089. (last accessed July 28, 2021).
[11]    *Id.*
[12]    2017 990 Form available at https://projects.propublica.org/nonprofits/organizations/951684089. (last accessed July 28, 2021).

PLAINTIFFS' CONSOLIDATED COMPLAINT FOR DAMAGES, RESTITUTION AND INJUNCTIVE/EQUITABLE RELIEF
3:21-cv-01135-GPC-MSB

executives also take home seven figure annual compensation packages, and several other employees earn in the high six figures.[13]

60.    Despite its impressive profitability and lavish executive compensation, Defendant pitches itself as an organization primarily committed to the public good. On its website, Defendant bills itself as "San Diego's trusted leader for quality healthcare." Defendant claims it seeks to carry out the vision of its founders by dedicating itself to "quality, safe, cost-efficient, socially responsible health care for everyone we serve." Defendant purports to be more than a mere healthcare provider, but "a partner who believes in the healthiest version of you."

61.    Defendant's failure to safeguard Representative Plaintiffs' and Class Members' highly sensitive data, despite having adequate resources to do so, belies this high-minded sentiment.

62.    In addition to violating its purported commitment to its patients and community, Defendant's failure to adequately secure Representative Plaintiffs' and Class Members' sensitive data also breaches duties it owes Representative Plaintiffs and Class Members under statutory and common law. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), healthcare providers have an affirmative duty to keep patients' Protected Health Information private. As a covered entity, Defendant has a statutory duty under HIPAA and other federal and state statutes to safeguard Representative Plaintiffs' and Class Members' data. Moreover, Defendant's promises of privacy and security induced Representative Plaintiffs and Class Members to share their PII/PHI with Defendant. Representative Plaintiffs and Class Members were entitled to, and did, rely on those promises. Because Defendant's promises foreseeably induced Representative Plaintiffs and Class Members to act in reliance on those promises, Defendant had a duty to Representative Plaintiffs and Class Members to fulfill those promises.

---

[13]    *Id.*

63.     Defendant violated its duty to Representative Plaintiffs and Class Members through its failure to protect against a foreseeable cyberattack–a perhaps unsurprising fact given that Scripps Health failed to satisfy its own "mission" of devoting its "resources to delivering quality, safe, cost effective, socially responsible health care services."

64.     While the greater efficiency of electronic health records translates to cost savings for providers, it also comes with the risk of privacy breaches. These electronic health records contain a plethora of sensitive information (e.g., patient data, patient diagnosis, lab results, RX's, treatment plans) that is valuable to cyber criminals. One patient's complete record can be sold for hundreds of dollars on the dark web.[14] Unsurprisingly, thus, the healthcare industry is at high risk and acutely affected by cyber-attacks.[15]

65.     Between 2005 and 2019, at least 249 million people were affected by health care data breaches.[16] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[17] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03% of overall health data breaches, according to cybersecurity firm Tenable.[18]

66.     Health data breaches are particularly concerning because they can lead not only to the disclosure of sensitive data, but to substandard treatment and negative health outcomes.[19] The devastating consequences of network interruption for

---

[14]   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B4-healthcare-08-00133 (last accessed July 28, 2021) (citing Chernyshev, M., Zeadally, S. & Baig, Z. Healthcare Data Breaches: Implications for Digital Forensic Readiness. J Med Syst 43, 7 (2019).
[15]   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4479128/. (last accessed July 28, 2021).
[16]   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133. (last accessed July 28, 2021).
[17]   https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/. (last accessed July 28, 2021).
[18]   https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches. (last accessed July 28, 2021).
[19]   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B8-healthcare-08-00133. (last accessed July 28, 2021).

patients is what makes health systems so tempting a target for attacks in the first place. Cybercriminals view patient care facilities as being more likely to pay ransoms to restore access to their systems since extended downtime is intolerable.[20] Indeed, as Representative Plaintiff Rubenstein experienced here, losing access to the system can have serious adverse consequences for patient health. Consequently, health data systems require enhanced security and should be breach-proof.[21]

67.    Because hacking attacks using malware or ransomware represent a significant portion of all data breaches or unlawful disclosures, healthcare providers should be prepared for such attacks. As one of California's largest and most visible healthcare systems, Defendant knew or should have known that it was a prime target for such attacks. As such, Defendant's failure to protect against the attack was negligent and or reckless in violation of its legal duty to Representative Plaintiffs and Class Members.

68.    The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged here are currently unknown to Representative Plaintiffs. Representative Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

## IV.    CLASS ACTION ALLEGATIONS

69.    Representative Plaintiffs bring this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following classes/subclass(es) (collectively, the "Class"):

---

[20]    https://www.cpomagazine.com/cyber-security/rise-in-healthcare-data-breaches-driven-by-ransomware-attacks/. (last accessed July 28, 2021).

[21]    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B8-healthcare-08-00133. (last accessed July 28, 2021).

**Nationwide Class:**

"All individuals within the United States of America whose PII/PHI was stored by Defendant and/or was exposed to unauthorized third parties as a result of the compromise of Scripps Health's data systems, as announced on or about June 1, 2021."

**California Subclass:**

"All individuals within the State of California whose PII/PHI was stored by Defendant and/or was exposed to unauthorized third parties as a result of the compromise of Scripps Health's data systems, as announced on or about June 1, 2021."

70.     Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

71.     Also, in the alternative, Representative Plaintiffs request additional Subclasses as necessary based on the types of PII/PHI that were compromised.

72.     Representative Plaintiffs reserve the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

73.     This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation and membership in the proposed classes is easily ascertainable.

a. Numerosity: A class action is the only available method for the fair and efficient adjudication of this controversy. The members of the Class are so numerous that joinder of all members is impractical, if not impossible. Representative Plaintiffs are informed and believe and, on that basis, allege that the total number of Class Members is in the hundreds of thousands of individuals. Defendant says it treats 700,000 patients annually. The personal health and financial information of each patient is required to be disclosed to Scripps Health as a necessity to provide quality care. Membership in the Class will be determined by an in-depth analysis of Defendant's records.

b. Commonality: The Representative Plaintiffs and the Class Members share a community of interests in that there are numerous common questions and issues of fact and law which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

1) Whether Defendant engaged in the wrongful conduct alleged herein;

2) Whether Defendant had a legal duty to Representative Plaintiffs and the Class to exercise due care in collecting, storing, using and/or safeguarding their PII/PHI;

3) Whether Defendant knew or should have known of the susceptibility of its data security systems to a data breach;

4) Whether Defendant's security procedures and practices to protect its systems were reasonable in light of the measures recommended by data security experts;

5) Whether Defendant's failure to implement adequate data security measures allowed the Data Breach to occur;

6) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

7) Whether Defendant adequately, promptly, and accurately informed Representative Plaintiffs and Class Members that their PII/PHI had been compromised;

8) How and when Defendant actually learned of the Data Breach;

9) Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and the Class;

10) Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of the PII/PHI of Representative Plaintiffs and Class Members;

11) Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

12) Whether Defendant's conduct, including their failure to act, resulted in or was the proximate cause of the Data Breach;

13) Whether Defendant's actions alleged herein constitute gross negligence;

14) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Representative Plaintiffs and Class Members;

15) Whether Representative Plaintiffs and Class Members are entitled to actual and/or statutory damages and/or whether injunctive, corrective and/or declaratory

relief and/or an accounting is/are appropriate as a result of Defendant's wrongful conduct and, if so, what is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs and members of the Class and the general public;

16) Whether Representative Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct;

17) Whether Representative Plaintiffs and Class Members are entitled to punitive damages;

18) Whether Defendant continues to breach duties to Plaintiffs and the Class;

c. Typicality: The Representative Plaintiffs' claims are typical of the claims of the Class. Representative Plaintiffs and all members of the Class sustained damages arising out of and caused by Defendant's common course of conduct in violation of law, as alleged herein. The same event and conduct that gave rise to Representative Plaintiffs' claims are identical to those that give rise to the claims of every Class Member because Representative Plaintiffs and each Class Member had their sensitive PII/PHI compromised in the same way by the same conduct of Defendant. Representative Plaintiffs sand all Class Members face the identical threats resulting from the breach of their PII/PHI without the protection of encryption and adequate monitoring of user behavior and activity necessary to identity those threats.

d. Adequacy of Representation: The Representative Plaintiffs in this class action are adequate representatives of each member of the Class in that the Representative Plaintiffs have the same interest in the litigation of this case as the Class Members, are committed to vigorous prosecution of this case and have retained competent counsel who are experienced in conducting litigation of this nature. Representative Plaintiffs are not

subject to any individual defenses unique from those conceivably applicable to other Class Members or the Class in its entirety. The Representative Plaintiffs anticipate no management difficulties in this litigation. Representative Plaintiffs and their counsel will fairly and adequately protect the interests of all Class Members.

e.  Superiority of Class Action: The damages suffered by individual Class Members, are significant, but may be small relative to the enormous expense of individual litigation by each member. This makes or may make it impractical for members of the Class to seek redress individually for the wrongful conduct alleged herein. Even if Class Members could afford such individual litigation, the court system could not. Should separate actions be brought or be required to be brought, by each individual member of the Class, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants. The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interests of other Class Members who are not parties to the adjudications and/or may substantially impede their ability to adequately protect their interests. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

74.    Class certification is proper because the question raised by this complaint is one of a common or general interest affecting numerous persons, such that it is impracticable to bring them all before the court.

75.    This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate

with respect to the Class in their entirety. Defendant's policies challenged herein apply to and affect Class Members uniformly and Representative Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class in its entirety, not on facts or law applicable only to the Representative Plaintiffs.

76.     Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII/PHI of Class Members, Defendant may continue to act unlawfully as set forth in this Complaint.

## V.     COMMON FACTUAL ALLEGATIONS

### *The California Attorney General Notice*

77.     On or about April 29, 2021, Defendant Scripps's network servers were subject to a ransomware attack through which unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' PII/PHI.

78.     Scripps sent a sample notice of data breach letter to the California Attorney General that mirrored the language of the Notice (defined below) sent to Plaintiffs and the Class.

79.     Pursuant to California Civ. Code § 1798.82(f), "[a] person or business that is required to issue a security breach notification pursuant to [§ 1798.82(a)] to more than 500 California residents as a result of a single breach of the security system shall electronically submit a single sample copy of that security breach notification, excluding any personally identifiable information, to the Attorney General."

80.     Plaintiffs' and Class Members' PII/PHI is "personal information" as defined by California Civ. Code § 1798.82(h).

81.     Pursuant to California Civ. Code § 1798.82(a)(1), data breach notification letters are sent to residents of California "whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person" due to a "breach of the security of the system."

82.   California Civ. Code § 1798.82(g) defines "breach of the security of the system" as the "unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business."

83.   The Data Breach was a "breach of the security of the system" as defined by California Civ. Code § 1798.82(g).

84.   Plaintiffs' and Class Members' unencrypted personal information was acquired by an unauthorized cybercriminal or cybercriminals as a result of the Data Breach.

85.   The security, confidentiality, or integrity of Plaintiffs' and Class Members' unencrypted personal information was compromised as a result of the Data Breach.

86.   Plaintiffs' and Class Members' unencrypted personal information that was acquired by an unauthorized person as a result of the Data Breach was viewed by unauthorized persons.

87.   It is reasonable to infer that Plaintiffs' and Class Members' unencrypted personal information that was acquired by an unauthorized person as a result of the Data Breach was viewed by unauthorized persons.

88.   After receiving letters similar to those sent pursuant to California Civ. Code § 1798.82(a)(1) – and filed with the Attorney General of California in accordance with California Civ. Code § 1798.82(f) – it is reasonable for recipients, including Plaintiffs and Class Members in this case, to (i) believe that the risk of future harm (including identity theft) is real and imminent, and (ii) take steps to mitigate that risk of future harm.

***The Data Breach and Defendant's Failed Response***

89.   On or about April 29, 2021, Defendant Scripps's network servers were subject to a ransomware attack through which unauthorized third-party

PLAINTIFFS' CONSOLIDATED COMPLAINT FOR DAMAGES, RESTITUTION AND INJUNCTIVE/EQUITABLE RELIEF
3:21-cv-01135-GPC-MSB

cybercriminals gained access to Representative Plaintiff's and Class Members' PII/PHI.

90.    On or around May 1, 2021, Defendant began identifying unusual network activity affecting some of its systems.

91.    As a result of this activity, Defendant's IT systems were suspended, including public-facing portals such as EPIC, MyScripps and scripps.org. These systems, which are critical for patient well-being as they allow patients to log into their MyScripps accounts to contact their physicians, access their medical information, and schedule appointments were, offline for nearly a month. During this outage, hospitals in Encitas, La Jolla, San Diego and Chula Vista no longer received certain patients such as stroke or heart attack victims. Instead, those persons in need were diverted to other medical facilities because of the backlog of requests.

92.    In addition to the patients harmed by the outage, many Scripps Health business support workers were unsure if and when they would receive their paychecks while the systems remained offline. As a result, many or all of them were instructed to either use their paid time off or work without pay during the month of May 2021, a blatant violation of California wage and hour laws.

93.    After becoming aware of the Breach, Defendant utilized the help of computer and forensic firms to launch an investigation into the Breach. The investigation revealed that an unauthorized person(s) accessed Defendant's network, deployed malware and acquired copies of documents that Defendant housed on its network systems.

94.    It was not until days later, on May 10, 2021, that Defendant identified only a few documents involved in the Breach. Those documents contained sensitive patient information including names, dates of birth, Social Security numbers and/or driver license numbers, health insurance information, medical record numbers, patient account numbers, and/or clinical information such as physician(s) names,

date(s) of service, doctor progress notes, lab test results, and/or other treatment information.

95.    On June 1, 2021, Defendant began mailing letters ("the Notice") to the more than 147,000 patients whose PII/PHI Defendant could confirm was compromised as a result of the Breach. Of the over 147,000 patients, Defendant already has admitted that about 2.5 percent also had their social security and drivers' license numbers compromised by the unauthorized person(s) behind the Breach. The letter informed patients of the Data Breach and Defendant's recommended next steps such as reviewing statements received from healthcare providers and insurers.

96.    The letter included the following:

> On May 1, 2021, we identified unusual network activity. We immediately initiated our incident response protocols, which included isolating potentially impacted devices and shutting off select systems. We also began an investigation with the assistance of computer forensic firms. The investigation determined that an unauthorized person gained access to our network, deployed malware, and, on April 29, 2021, acquired copies of some of the documents on our system. On May 10, 2021, we discovered that some of those documents contained patient information. Upon conducting a review of those documents, we determined that one or more files may have reflected your name, address, date of birth, health insurance information, medical record number, patient account number, and/or clinical information, such as physician name, date(s) of service, and/or treatment information.

> We have no indication that any of your information has been used to commit fraud. However, we recommend that you review the statements you receive from your healthcare providers and health insurer. If you see any medical services that you did not receive, please call the provider or insurer immediately. To help prevent something like this from happening again, we are

continuing to implement enhancements to our information security, systems, and monitoring capabilities.[22]

97.    The letter also informed patients whose Social Security or driver's license numbers were thought exposed during the attack that they would be offered a complimentary one-year membership of Experian IdentityWorksSM Credit 3B. This product is marketed as helping to detect possible misuse of personal information and to provide users with identity protection support focused on immediate identification and resolution of identity theft.

98.    Scripps sent a sample notice of data breach letter that mirrored the language of the Notice sent to Representative Plaintiffs and Class Members the California Attorney General's Office.

99.    It is apparent from the various notices and sample notices of the Data Breach sent to Representative Plaintiffs, the Class, and state Attorneys General that the PII/PHI contained on Defendant's servers was not encrypted.

100.    Following discovery of the Data Breach, Defendant began to investigate and address the Data Breach. Based upon the investigation, the attackers were able to access certain network servers containing the PII/PHI at issue, which was being held, unencrypted and unprotected.

101.    Upon information and belief, the unauthorized third-party cybercriminals gained access to the PII/PHI with the intent of engaging in misuse of the PII/PHI, including marketing and selling Representative Plaintiffs' and Class Members' PII/PHI.

102.    In spite of the severity of the Data Breach, Defendant has done very little to protect Representative Plaintiffs and the Class. For example, in the Notice, Defendant only provides twelve (12) months of identity theft and credit monitoring protection to a select few Data Breach victims. This complimentary service is a token

---

[22] Scripps- Letter Sample.pdf (ca.gov) (last visited June 17, 2021).

gesture that does little if anything to remedy the harm Defendant's misconduct caused. This does not and will not fully protect the patients from cyber criminals and is largely ineffective against protecting data after it has been stolen. Cyber criminals are fully aware of the well-publicized preventative measures taken by entities after data breaches such as that which happened here and will, therefore, oftentimes hold onto the stolen data and not use it until after the complimentary service is no longer active, and long after victim concerns and preventative steps have diminished.

103.   In effect, Defendant is shirking its responsibility for the harm and increased risk of harm it has caused Representative Plaintiffs and members of the Class, including the distress and financial burdens the Data Breach has placed upon the shoulders of the Data Breach victims.

104.   The Notice fails to provide the consolation Representative Plaintiffs and Class Members seek and certainly falls far short of eliminating the substantial risk of fraud and identity theft Representative Plaintiffs and the Class now face.

105.   Ransomware creators, such as the authors of Defendant's Data Breach, "are criminals without any ethics," so there is no guarantee they will do what they promise to do in exchange for any ransom money they receive.

106.   To make matters worse, Defendant's attackers actually gained access to, and possession of, Representative Plaintiffs' and Class Members' PII/PHI. While many ransomware attacks merely involve the attacker gaining control of the computer or network without access to the victims' information, the ransomware attack on Defendant's systems gave the attackers access to, and possession of, Representative Plaintiffs' and Class Members' PII/PHI.

107.   Moreover, paying the ransom (if Scripps did indeed pay the ransom) will only encourage attackers to carry out these types of cyberattacks on Scripps's system networks in the future. Since Defendant still maintains substantial PII/PHI belonging to Representative Plaintiffs and Class Members, anything that makes

future attacks more likely is seriously injurious to them. Representative Plaintiffs and Class Members face no good outcomes.

108. Defendant had obligations created by HIPAA, the California Confidentiality of Medical Records Act ("CMIA"), reasonable industry standards, common law, state statutory law, and its own assurances and representations to keep patients' PII/PHI confidential and to protect such PII/PHI from unauthorized access.

109. Representative Plaintiffs and Class Members were required to provide their PII/PHI to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

110. The stolen PII/PHI at issue has great value to the ransomware attackers, due to the large number of individuals affected and the fact that health insurance information, clinical information, driver's license numbers, and Social Security numbers were part of the data that was compromised.

111. Defendant understood that "it is the expectation of [its] members" and "a requirement of State and Federal law" to "protect the privacy of health information." To this end, Defendant "ensure[s] the privacy of confidential medical records and related information for all patients" and regards its "primary responsibility is to safeguard [its members'] personal health information."[23]

112. Defendant made clear it would "notify [its members] in the event [it] bec[a]me aware of an unauthorized access, use or disclosure of [members'] unsecured protected health information."[24]

113. Despite this, Representative Plaintiffs and the Class Members remain, even today, in the dark regarding what data was stolen, the particular malware used, and what steps are being taken to secure their PII/PHI going forward. Indeed, even

---

[23] https://www.scripps.org/sparkle-assets/documents/100-8560-217sw-english.pdf (last visited July 28, 2021).
[24] *Id.*

the particular "computer forensic firms" being employed is left a mystery, such that the quality of that forensic work is left in question. Especially in light of Defendant's suggestion that patients "review the statements [they] receive from [their] healthcare providers and health insurer[s]," Representative Plaintiffs and Class Members are left to speculate as to the full impact of the Data Breach and how exactly Defendant intends to "enhance" its information security, systems, and monitoring capabilities so as to prevent further breaches.

114.   Representative Plaintiffs' and Class Members' information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII/PHI for targeted marketing without the approval of Representative Plaintiffs and/or Class Members. Either way, unauthorized individuals can easily access the PII/PHI of Representative Plaintiffs and Class Members.

**_Defendant Collected, Stored, and Maintained Representative Plaintiffs' and Class Members' PII/PHI_**

115.   Defendant acquired, collected, and stored Representative Plaintiffs' and Class Members' PII/PHI.

116.   At all relevant times, Defendant knew or should have known that its patients would use Scripps Health to store and/or share sensitive data, including highly confidential PII/PHI, because Defendant promised those patients that creating personal healthcare records would improve their health care quality.

117.   Indeed, personal health records can improve patient engagement, coordinate and combine information from multiple healthcare providers, ensure availability of patient information online, reduce administrative costs and enhance provider-patient communication. Such benefits are a potent inducement to share even the most sensitive information with Defendant.

118.   By obtaining, collecting, and storing Representative Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or

should have known that it was responsible for protecting Representative Plaintiffs' and Class Members' PII/PHI from unauthorized disclosure.

119.   Representative Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PI PII/PHI I. Representative Plaintiffs and Class Members relied on Defendant to keep their PII/PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

120.   Defendant could have prevented this Data Breach by properly securing and encrypting Representative Plaintiffs' and Class Members' PII/PHI.

121.   Defendant's negligence in safeguarding Representative Plaintiffs' and Class Members' PII/PHI is exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

122.   The healthcare industry has experienced a large number of high-profile cyber-attacks even in just the one-year period preceding the filing of this Complaint and cyber-attacks, generally, have become increasingly more common. More healthcare data breaches were reported in 2020 than in any other year, showing a 25% increase.[25] Additionally, according to the HIPAA Journal, the largest healthcare data breaches have been reported in April 2021.[26]

123.   For example, one of Scripps Health's competitors, Universal Health Services, experienced a cyber-attack on September 29, 2020 that was very similar to the attack on Scripps Health. Not unlike Scripps Health, Universal Health Services suffered a four-week outage of its systems which caused as much as $67 million in recovery costs and lost revenue.[27] Due to the high-profile nature of the Universal

---

[25]   https://www.hipaajournal.com/2020-healthcare-data-breach-report-us/ (last accessed July 28, 2021).
[26]   https://www.hipaajournal.com/april-2021-healthcare-data-breach-report/ (last accessed July 28, 2021).
[27]   https://ir.uhsinc.com/news-releases/news-release-details/universal-health-services-inc-reports-2020-fourth-quarter-and (last accessed July 28, 2021).

Health Services breach, and other breaches of its kind, Scripps Health was and/or certainly should have been on notice and aware of such attacks occurring in the healthcare industry and, therefore, should have assumed and adequately performed the duty of preparing for such an imminent attack.

124. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect Representative Plaintiffs' and Class Members' PII/PHI from being compromised.

***Defendant had an Obligation to Protect PII/PHI Under Federal Law and the Applicable Standard of Care***

125. Defendant is covered by HIPAA (45 C.F.R. § 160.102). As such, it is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

126. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

127. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

128. HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

129. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

130. HIPAA's Security Rule requires Defendant to do the following:

    a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

    b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

    c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

    d. Ensure compliance by their workforce.

131. HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

132. Moreover, the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414 requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

133. Defendant was also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data

security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. See, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015).

134.   In addition to its obligations under federal and state laws, Defendant owed a duty to Representative Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII/PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Representative Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PII/PHI of the Class.

135.   Defendant owed a duty to Representative Plaintiffs and the Class to design, maintain, and test its computer systems and networks to ensure that the PII/PHI in its possession was adequately secured and protected.

136.   Defendant owed a duty to Representative Plaintiffs and the Class to create and implement reasonable data security practices and procedures to protect the PII/PHI in its possession.

137.   Defendant owed a duty to Representative Plaintiffs and the Class to implement processes that would detect a breach on its data security systems in a timely manner.

138.   Defendant owed a duty to Representative Plaintiffs and the Class to act upon data security warnings and alerts in a timely fashion.

139.   Defendant owed a duty to Representative Plaintiffs and the Class to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PII/PHI from theft because such an inadequacy would be a material fact in the decision to entrust PII/PHI with Defendant.

140.   Defendant owed a duty of care to Representative Plaintiffs and the Class because they were foreseeable and probable victims of any inadequate data security practices.

141.   Defendant owed a duty to Representative Plaintiffs and the Class to encrypt Representative Plaintiffs' and Class Members' PII/PHI and monitor user behavior and activity in order to identity possible threats.

***Defendant was on Notice of Cyber Attack Threats in the Healthcare Industry and of the Inadequacy of its Data Security***

142.   Defendant was on notice that companies in the healthcare industry were targets for cyberattacks.

143.   Defendant was on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."

144.   The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

145.   Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.

146.   As implied by the above quote from the AMA, stolen PII/PHI can be used to interrupt important medical services themselves. This is an imminent and certainly impending risk for Representative Plaintiffs and Class Members.

147.   Defendant was on notice that the federal government has been concerned about healthcare company data encryption. Defendant knew it kept protected health information on its servers and yet it appears Defendant did not encrypt this information.

148.   The United States Department of Health and Human Services' Office for Civil Rights urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, the DHHS's Office of Human Rights' deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."

149.   As a covered entity under HIPA and other relevant statutes, Defendant should have known its systems were prone to ransomware and other types of cyberattacks and sought better protection for the PII/PHI accumulating in its system networks.

**_The Value of Personal Identifiable Information and Protected Health Information_**

150.   The data accessed in such an attack represents a major score for cybercriminals. This information is of great value to them and the data stolen in the Data Breach will be used in a variety of sordid ways for criminals to exploit Representative Plaintiffs and the Class Members and to profit off their misfortune.

151.   Indeed, it is well known and the subject of many media reports that Personal Information is highly coveted and a frequent target of hackers. Despite the frequent public announcements of data breaches of corporate entities, Defendant maintained an insufficient and inadequate system to protect the Personal Information of Representative Plaintiffs and Class Members.

152.   Personal Information is a valuable commodity for which a "cyber black market" exists in which criminals openly post stolen payment card numbers, social

security numbers, and other personal information on a number of underground Internet websites.

153. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[28] For example, with the PII/PHI stolen in the Data Breach, including Social Security numbers and driver's licenses, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[29] These criminal activities have and will result in devastating financial and personal losses to Representative Plaintiff and Class Members.

154. Indeed, it is well known and the subject of many media reports that Personal Information is highly coveted and a frequent target of hackers. Despite the frequent public announcements of data breaches of corporate entities, Defendant maintained an insufficient and inadequate system to protect the Personal Information of Representative Plaintiffs and Class Members.

155. PII/PHI is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.

156. For example, it is believed that certain PII/PHI compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related benefits in the state of Oklahoma. Such fraud will be an omnipresent threat for Representative Plaintiffs and Class Members for the rest of their lives. They will need to remain constantly vigilant for identity theft.

---

[28] "Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").
[29] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/. (last accessed July 28, 2021).

157.   The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

158.   Identity thieves can use personal information, such as that of Representative Plaintiffs and Class Members which Defendant failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

159.   Legitimate organizations and the criminal underground alike recognize the value in Personal Information contained in a merchant's data systems; otherwise, they would not aggressively seek or pay for it. For example, in "one of 2013's largest breaches . . . not only did hackers compromise the [card holder data] of three million patients, they also took registration data [containing Personal Information] from 38 million users." (See, Verizon 2014 PCI Compliance Report, available at: https://www.centurybizsolutions.net/wp-content/uploads/2014/09/PCI-Compliance-report-2014.pdf, at 54).

160.   The ramifications of Defendant's failure to keep secure Representative Plaintiffs' and Class Members' PII/PHI are long lasting and severe. Once PII/PHI is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

161.   As such, the PII/PHI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[30] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[31] Criminals can also purchase access to entire company data breaches from $999 to $4,995.[32]

162.   Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[33]

163.   What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not

---

[30]   *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed July 28, 2021).

[31]   *Here's How Much Your Personal Information Is Selling for on the Dark Web,* Experian, Dec. 6, 2017, *available at:* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed July 28, 2021).

[32]   *In the Dark,* VPNOverview, 2019, *available at:* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed July 28, 2021).

[33]   Social Security Administration, *Identity Theft and Your Social Security Number*, *available at:* https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed July 28, 2021).

1   permitted; an individual must show evidence of actual, ongoing fraud activity to

2   obtain a new number.

3      164.   Even then, a new Social Security number may not be effective.

4   According to Julie Ferguson of the Identity Theft Resource Center, "The credit

5   bureaus and banks are able to link the new number very quickly to the old number,

6   so all of that old bad information is quickly inherited into the new Social Security

7   number."[34]

8      165.   Based on the foregoing, the information compromised in the Data

9   Breach is significantly more valuable than the loss of, for example, credit card

10   information in a retailer data breach, because, there, victims can cancel or close

11   credit and debit card accounts.

12      166.   The information compromised in this Data Breach is impossible to

13   "close" and difficult, if not impossible, to change—Social Security number, driver's

14   license numbers or government-issued identification numbers, names, and dates of

15   birth.

16      167.   This data demands a much higher price on the black market. Martin

17   Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to

18   credit card information, personally identifiable information and Social Security

19   numbers are worth more than 10x on the black market."[35]

20      168.   Among other forms of fraud, identity thieves may obtain driver's

21   licenses, government benefits, medical services, and housing or even give false

22   information to police.

23

24

25   [34]   Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR

26   (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last accessed July 28, 2021).

27   [35]   Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*:

28   https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed July 28, 2021).

169.    The PII/PHI of Representative Plaintiffs and Class Members was taken by hackers to engage in identity theft or to sell it to other criminals who will purchase the PII/PHI for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

170.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII/PHI is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[36]

171.    In this context, at all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding Representative Plaintiffs' and Class Members' PII/PHI, including social security numbers, driver's license or state identification numbers, and/or dates of birth, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Representative Plaintiffs and Class Members as a result of a breach.

172.    As a result of the Data Breach, the Personal Information of Representative Plaintiffs and Class Members has been exposed to criminals for misuse. The injuries suffered by Representative Plaintiffs and Class Members, or likely to be suffered thereby as a direct result of the Defendant's Data Breach, include:

---

[36] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* http://www.gao.gov/new.items/d07737.pdf (last accessed July 28, 2021).

a.  unauthorized use of their Personal Information;

b.  theft of their personal and financial information;

c.  costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d.  damages arising from the inability to use their Personal Information;

e.  Improper disclosure of their PII/PHI;

f.  loss of privacy, and embarrassment;

g.  trespass and damage their personal property, including PII/PHI;

h.  the imminent and certainly impending risk of having their confidential medical information used against them by spam callers and/or hackers targeting them with phishing schemes to defraud them;

i.  costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to ameliorate, mitigate and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, purchasing credit monitoring and identity theft protection services, and the stress, nuisance and annoyance of dealing with all issues resulting from the Data Breach;

j.  the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Personal Information being placed in the hands of criminals and already misused via the sale of Representative Plaintiffs' and Class Members' information on the Internet black market;

k.  damages to and diminution in value of their Personal Information entrusted to Defendant for the sole purpose of purchasing products and services from Defendant; and the loss of Representative Plaintiffs' and Class Members' privacy.

173.   The harm to Representative Plaintiffs and Class Members is especially acute given the nature of the leaked data. Medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more

than identity thefts involving banking and finance, the government and the military, or education.[37]

174.  "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[38]

175.  If cyber criminals manage to access financial information, health insurance information, and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Defendant may expose the Representative Plaintiffs and Class Members.

176.  A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[39] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve their identity theft at all.[40]

177.  The injuries to the Representative Plaintiffs and Class Members were directly and proximately cause by Defendant's failure to implement or maintain adequate data security measures for this Personal Information.

178.  The Data Breach was the inevitable result of Defendant's inadequate approach to data security and the protection of the Personal Information that it

---

[37]  Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/. (last accessed July 28, 2021).
[38]  *Id.*
[39]  See Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.
[40]  Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/. (last accessed July 28, 2021).

collected during the course of business and, as such, Defendant could have prevented this Data Breach. It had the resources to prevent a breach, but neglected to adequately invest in data security, despite the growing number of well-publicized data breaches.

179.   Had Defendant remedied the deficiencies in its data security systems, followed security guidelines, and adopted security measures recommended by experts in the field, Defendant would have prevented the Data Breach and, ultimately, the theft of its patients' Personal Information.

180.   Representative Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Class Members are incurring and will continue to incur such damages in addition to any actual fraudulent usage of their PII/PHI.

181.   The injuries to Representative Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII/PHI of Representative Plaintiffs and Class Members.

182.   This was a financially motivated Data Breach, as apparent from the ransom money sought by the cyber criminals, who will continue to seek to profit off of the sale of Representative Plaintiffs' and the Class Members' PII/PHI on the dark web. The PII/PHI exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein.

183.   These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[41]

---

[41]   Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info. (last accessed July 28, 2021).

184.   Data breaches are preventable.[42] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[43] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[44]

185.   Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[45]

186.   Defendant required Representative Plaintiffs and Class Members to surrender their PII/PHI – including but not limited to their names, addresses, driver's licenses, Social Security numbers, medical information, and health insurance information – and was entrusted with properly holding, safeguarding, and protecting against unlawful disclosure of such PII/PHI.

187.   Many failures laid the groundwork for the success ("success" from the cybercriminals' viewpoint) of the Data Breach, starting with Defendant's failure to incur the costs necessary to implement adequate and reasonable cyber security protections, procedures and protocols necessary to safeguard Representative Plaintiffs' and Class Members' PII/PHI. Yet it did not do so.

188.   Defendant knew of the importance of safeguarding Plaintiffs' and Class Members' PII/PHI and of the foreseeable consequences that would occur if Plaintiff's and Class Members' PII/PHI was stolen, including the significant costs

---

[42]   Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012)
[43]   *Id.* at 17.
[44]   *Id.* at 28.
[45]   *Id.*

that would be placed on Plaintiff and Class members as a result of a breach of this magnitude.

189. As detailed above, Defendant is a large, sophisticated organization with the resources to deploy robust cybersecurity protocols. It knew, or should have known, that the development and use of such protocols were necessary to fulfill its statutory and common law duties to Representative Plaintiffs, Class Members, and all of its patients. Its failure to do so is, therefore, intentional, willful, reckless and/or grossly negligent.

190. The mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' PII/PHI was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure Plaintiffs' and Class Members' PII/PHI from those risks left that information in a dangerous condition.

191. Defendant disregarded the rights of Representative Plaintiffs and Class Members by, inter alia, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Representative Plaintiffs' and Class Members' PII/PHI; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Representative Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

///

///

///

///

**COUNT I**
**NEGLIGENCE**
**(On behalf of the Nationwide Class or, alternatively, on behalf of the California Subclass)**

192.   Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

193.   At all times herein relevant, Defendant owed Representative Plaintiffs and members of each class a duty of care, *inter alia*, to act with reasonable care to secure and safeguard the Personal Information of Representative Plaintiffs and Class Members and to use commercially reasonable methods to do so. Defendant took on this obligation upon accepting and storing the Personal Information of Representative Plaintiffs and Class Members in its computer systems and on its networks.

194.   Among these duties, Defendant was expected:

    a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Personal Information in its possession;

    b.    to protect Personal Information using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

    c.    to implement processes to quickly detect the Data Breach and to timely act on warnings about data breaches.

    d.    To promptly notify Representative Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their PII/PHI.

195.   Defendant knew that the Personal Information was private and confidential and should be protected as private and confidential and, thus, Defendant owed a duty of care not to subject Representative Plaintiffs and Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

196. Defendant knew, or should have known, of the risks inherent in collecting and storing Personal Information, the vulnerabilities of its data security systems, and the importance of adequate security. Defendant knew about numerous, well-publicized data breaches.

197. Defendant knew, or should have known, that its data systems and networks did not adequately safeguard Representative Plaintiffs' and/or Class Members' Personal Information.

198. Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the PII/PHI that Plaintiff and the Class had entrusted to it.

199. Defendant breached its duties to Representative Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Personal Information of Representative Plaintiffs and Class Members.

200. Because Defendant knew that a breach of its systems would damage hundreds of thousands of individuals, including Representative Plaintiffs and Class Members, Defendant had a duty to adequately protect its data systems and the Personal Information contained thereon.

201. Representative Plaintiffs' and Class Members' willingness to entrust Defendant with their Personal Information was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems and the Personal Information its stored on them from attack.

202. Defendant had a special relationship with Representative Plaintiffs and Class Members.

203. Defendant also had independent duties under state and federal laws that required Defendant to reasonably safeguard Representative Plaintiffs' and Class Members' Personal Information and promptly notify them about the Data Breach.

These "independent duties" are untethered to any contract between Defendant and Representative Plaintiffs and/or Class Members.

204. Defendant breached its general duty of care to Representative Plaintiffs and Class Members in, but not necessarily limited to, the following ways:

a. by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Personal Information of Representative Plaintiffs and Class Members;

b. by failing to timely and accurately disclose that Representative Plaintiffs' and Class Members' Personal Information had been improperly acquired or accessed;

c. by failing to adequately protect and safeguard Personal Information by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Personal Information;

d. by failing to provide adequate supervision and oversight of the Personal Information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather Personal Information of Representative Plaintiffs and Class Members, misuse the Personal Information and intentionally disclose it to others without consent.

e. Failing to adequately train its employees to not store PII/PHI longer than absolutely necessary;

f. Failing to consistently enforce security policies aimed at protecting Representative Plaintiffs' and the Class Members' and Medical Information;

g. Failing to implement processes to quickly detect data breaches, security incidents, or intrusions; and

h. Failing to encrypt Representative Plaintiffs' and Class Members' Medical Information and monitor user behavior and activity in order to identify possible threats.

205. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

206.   As a proximate and foreseeable result of Defendant's grossly negligent conduct, Representative Plaintiffs and Class Members  have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

207.   The law further imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of the Personal Information to Representative Plaintiffs and Class Members so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Personal Information.

208.   Defendant breached its duty to notify Representative Plaintiffs and Class Members of the unauthorized access by waiting a month after learning of the breach to notify Representative Plaintiffs and Class Members and then by failing to provide Representative Plaintiffs and Class Members sufficient information regarding the breach. To date, Defendant has not provided sufficient information to Representative Plaintiffs and Class Members regarding the extent of the unauthorized access and continues to breach its disclosure obligations to Representative Plaintiffs and Class Members.

209.   Further, through its failure to provide timely and clear notification of the Data Breach to Representative Plaintiffs and Class Members, Defendant prevented Representative Plaintiffs and Class Members from taking meaningful, proactive steps to secure their PII/PHI, and to access their medical records and histories.

210.   There is a close causal connection between Defendant's failure to implement security measures to protect the PII/PHI of Representative Plaintiffs and Class Members and the harm suffered or risk of imminent harm suffered by Representative Plaintiffs and Class Members. Representative Plaintiffs' and Class Members' PII/PHI was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII/PHI by adopting, implementing, and maintaining appropriate security measures.

211.   Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

212.   The damages Representative Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

213.   Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII/PHI. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

214.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtained and stored and the foreseeable consequences of the immense damages that would result to Representative Plaintiffs and Class Members.

215.   Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.* Defendant also violated the HIPAA Privacy and Security rules which likewise constitutes negligence *per se.*

216.   As a direct and proximate result of Defendant's negligence and negligence *per se*, Representative Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII/PHI is used;(iii) the compromise, publication, and/or theft of their PII/PHI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII/PHI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to

efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) lost continuity in relation to their healthcare; (vii) costs associated with placing freezes on credit reports; (viii) the continued risk to their PII/PHI, which may remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Representative Plaintiffs' and Class Members' PII/PHI in its continued possession; and (ix) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of Representative Plaintiffs and Class Members.

217. As a direct and proximate result of Defendant's negligence and negligence *per se*, Representative Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

218. Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Representative Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their PII/PHI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII/PHI in its continued possession.

## COUNT II
## INVASION OF PRIVACY
### (On behalf of the Nationwide Class or, alternatively, on behalf of the California Subclass)

219. Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

220.   Representative Plaintiffs and Class Members had a legitimate expectation of privacy to their PII/PHI and were entitled to the protection of this information against disclosure to unauthorized third parties.

221.   Defendant owed a duty to Representative Plaintiffs and Class Members to keep their PII/PHI confidential.

222.   Defendant failed to protect and released to unknown and unauthorized third parties the PII/PHI of Representative Plaintiffs and Class Members.

223.   Defendant allowed unauthorized and unknown third parties access to and examination of the PII/PHI of Representative Plaintiffs and Class Members, by way of Defendant's failure to protect the PII/PHI.

224.   The unauthorized release to, custody of, and examination by unauthorized third parties of the PII/PHI of Representative Plaintiffs and Class Members is highly offensive to a reasonable person.

225.   The unauthorized intrusion was into a place or thing which was private and is entitled to be private. Representative Plaintiffs and Class Members disclosed their PII/PHI to Defendant as part of obtaining services from Defendant, but privately with an intention that the PII/PHI would be kept confidential and would be protected from unauthorized disclosure. Representative Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

226.   The Data Breach at the hands of Defendant constitutes an intentional interference with Representative Plaintiffs' and Class Members' interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

227.   Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it was with actual knowledge that its information security practices were inadequate and insufficient.

228.   Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Representative Plaintiffs and Class Members.

229.   As a proximate result of the above acts and omissions of Defendant, the PII/PHI of Representative Plaintiffs and Class Members was disclosed to third parties without authorization, causing Representative Plaintiffs and Class Members to suffer damages.

230.   Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Representative Plaintiffs and Class Members in that the PII/PHI maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Representative Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Representative Plaintiffs and/or Class Members.

### COUNT III
### BREACH OF CONFIDENCE
### (On behalf of the Nationwide Class or, alternatively, on behalf of the California Subclass)

231.   Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

232.   At all times during Representative Plaintiffs' and Class Members' interactions with Defendant, Defendant was fully aware of the confidential nature of the PII/PHI that Representative Plaintiffs and Class Members provided to it.

233.   As alleged herein and above, Defendant's relationship with Representative Plaintiffs and the Class was governed by promises and expectations that Representative Plaintiffs and Class Members' PII/PHI would be collected, stored, and protected in confidence, and would not be accessed by, acquired by,

appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties.

234. Representative Plaintiffs and Class Members provided their respective PII/PHI to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII/PHI to be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties.

235. Representative Plaintiff and Class Members also provided their PII/PHI to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect their PII/PHI from unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing, such as following basic principles of protecting their networks and data systems.

236. Defendant voluntarily received, in confidence, Representative Plaintiffs' and Class Members' PII/PHI with the understanding that the PII/PHI would not be accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by the public or any unauthorized third parties.

237. Due to Defendant's failure to prevent, detect, and avoid the Data Breach from occurring by, inter alia, not following best information security practices to secure Representative Plaintiffs' and Class Members' PII/PHI, Representative Plaintiffs' and Class Members' PII/PHI was accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties beyond Representative Plaintiffs' and Class Members' confidence, and without their express permission.

238. As a direct and proximate cause of Defendant's actions and/or omissions, Representative Plaintiffs and Class Members have suffered damages as alleged herein.

239.   But for Defendant's failure to maintain and protect Representative Plaintiffs' and Class Members' PII/PHI in violation of the parties' understanding of confidence, their PII/PHI would not have been accessed by, acquired by, appropriated by, disclosed to, encumbered by, exfiltrated by, released to, stolen by, used by, and/or viewed by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the misuse of Representative Plaintiffs' and Class Members' PII/PHI, as well as the resulting damages.

240.   The injury and harm Representative Plaintiffs and Class Members suffered and will continue to suffer was the reasonably foreseeable result of Defendant's unauthorized misuse of Representative Plaintiffs' and Class Members' PII/PHI. Defendant knew its data systems and protocols for accepting and securing Representative Plaintiffs' and Class Members' PII/PHI had security and other vulnerabilities that placed Representative Plaintiffs' and Class Members' PII/PHI in jeopardy.

241.   As a direct and proximate result of Defendant's breaches of confidence, Representative Plaintiffs and Class Members have suffered and will suffer injury, as alleged herein, including but not limited to (a) actual identity theft; (b) the compromise, publication, and/or theft of their PII/PHI; (c) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII/PHI; (d) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (e) the continued risk to their PII/PHI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Class Members' PII/PHI in their continued possession; (f) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the

1   lives of Representative Plaintiffs and Class Members; and (g) the diminished value
2   of Representative Plaintiffs' and Class Members' PII/PHI; and (h) the diminished
3   value of Defendant's services Representative Plaintiffs and Class Members paid for
4   and received.

5
6   **COUNT IV**
    **CALIFORNIA CUSTOMER RECORDS ACT (CAL. CIV. CODE §1798.80, ET SEQ.)**
7   **(On behalf of the California Subclass Only)**

8   242.   Each and every allegation of the preceding paragraphs is incorporated
9   in this cause of action with the same force and effect as though fully set forth herein.

10   243.   Representative Plaintiffs and members of the California subclass
11   further bring this cause of action, seeking equitable and statutory relief to stop the
12   misconduct of Defendant, as complained of herein.

13   244.   The knowing conduct of Defendant, as alleged herein, constitutes an
14   unlawful and/or fraudulent business practice, as set forth in California Business &
15   Professions Code §§17200-17208. Specifically, Defendant conducted business
16   activities while failing to comply with the legal mandates cited herein, including
17   HIPAA. Such violations include, but are not necessarily limited to:

18          a.   failure to maintain adequate computer systems and data security
19               practices to safeguard Personal Information;
             b.   failure to disclose that its computer systems and data security
20               practices were inadequate to safeguard Personal Information from
21               theft;
             c.   failure to timely and accurately disclose the Data Breach to
22               Representative Plaintiffs and members of the California subclass;
23          d.   continued acceptance of Personal Information and storage of other
                 personal information after Defendant knew or should have known
24               of the security vulnerabilities of the systems that were exploited in
25               the Data Breach; and
             e.   continued acceptance of Personal Information and storage of other
26               personal information after Defendant knew or should have known
27               of the Data Breach and before it allegedly remediated the Breach.

28

245.   Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Personal Information of Representative Plaintiffs and members of the California subclass, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

246.   In engaging in these unlawful business practices, Defendant has enjoyed an advantage over its competition and a resultant disadvantage to the public and members of the California subclass.

247.   Defendant's knowing failure to adopt policies in accordance with and/or adhere to these laws, all of which are binding upon and burdensome to Defendant's competitors, engenders an unfair competitive advantage for Defendant, thereby constituting an unfair business practice, as set forth in California Business & Professions Code §§17200-17208.

248.   Defendant has clearly established a policy of accepting a certain amount of collateral damage, as represented by the damages to Representative Plaintiffs and members of the California subclass herein alleged, as incidental to its business operations, rather than accept the alternative costs of full compliance with fair, lawful and honest business practices ordinarily borne by responsible competitors of Defendant and as set forth in legislation and the judicial record.

249.   Representative Plaintiffs and members of the California subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Representative Plaintiffs and members of the California subclass any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §17200, et seq.; and for such other relief set forth below.

///

///

**COUNT V**

**VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL
RECORDS ACT (CAL. CIV. CODE §56, ET SEQ.)**
**(On behalf of the California Subclass Only)**

250.   Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

251.   Under California Civil Code section 56.06, Defendant is deemed a "provider of healthcare" and is therefore subject to the CMIA, California Civil Code sections 56.10(a), (d) €, 56.36(b), 56.101(a) and (b).

252.   Under CMIA, California Civil Code section 56.05(k), Representative Plaintiffs and Class Members are deemed "patients."

253.   As defined in CMIA, California Civil Code section 56.05(j), Defendant disclosed "medical information" to unauthorized persons without obtaining consent, in violation of section 56.10(a). Defendant's misconduct, including failure to adequately detect, protect, and prevent unauthorized disclosure, directly resulted in the unauthorized disclosure of Representative Plaintiffs and Class Members' PII/PHI to unauthorized persons.

254.   Defendant's misconduct, including protecting and preserving the confidential integrity of its members' PII, resulted in unauthorized disclosure of sensitive and confidential PII that belongs to Representative Plaintiffs and Class Members to unauthorized persons, breaching the confidentiality of that information, thereby violating California Civil Code sections 56.06 and 56.101(a)..

255.   Representative Plaintiffs and Class Members have all been and continue to be harmed as a direct, foreseeable and proximate result of Defendant's breach because Representative Plaintiffs and Class Members face, now and in the future, an imminent threat of identity theft, fraud and  for ransom demands. They must now spend time, effort and money to constantly monitor their accounts and credit to surveille for any fraudulent activity.

256.   Representative Plaintiffs and Class Members were injured and have suffered damages, as described above, from Defendant's illegal disclosure and negligent release of their medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and therefore seek relief under Civ. Code §§ 56.35 and 56.36, including actual damages, nominal statutory damages of $1,000, punitive damages of $3,000, injunctive relief, and attorney fees, expenses, and costs.

**COUNT VI**
**DECLARATORY RELIEF**
**(On behalf of the Nationwide Class or, alternatively, on behalf of the California Subclass)**

257.   Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

258.   Plaintiffs bring this Count under the federal Declaratory Judgment Act, 28 U.S.C. § 2201.

259.   As previously alleged, Plaintiffs and Class Members were parties to an implied contract with Defendant that required Defendant to provide adequate security for the PII/PHI it collected from Plaintiffs and the Class.

260.   Defendant owed (and continues to owe) a duty of care to Plaintiffs and Class Members requiring Defendant to adequately secure PII/PHI.

261.   Defendant still possesses Plaintiffs' and Class Members' PII/PHI.

262.   Since the Data Breach, Defendant has announced few if any changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices that permitted the Data Breach to occur and go undetected for months.

263.   Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs and the Class. In fact, now that Defendant's insufficient data security is known to other ransomware attackers, the PII/PHI in Defendant's possession is even more vulnerable to subsequent and continuous cyberattacks.

264. Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and the members of the Class. Further, Plaintiff and members of the Class are at risk of additional or further harm due to the nature of the ransomware attack at issue, the exposure of their PII/PHI, and Defendant's failure to address the security failings that led to such exposure.

265. There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach to meet Defendant's contractual obligations and legal duties.

266. Plaintiffs, therefore, seek a declaration that Defendant's existing security measures do not comply with their contractual obligations and duties of care to provide adequate security and that, to comply with their contractual obligations and duties of care, Defendant must implement and maintain additional security measures.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Representative Plaintiffs, on behalf of themselves and each member of the proposed Nationwide Class and the California Subclass, respectfully request that the Court enter judgment in their favor and for the following specific relief against Defendant as follows:

1. That the Court declare, adjudge, and decree that this action is a proper class action and certify each of the proposed classes and/or any other appropriate subclasses under F.R.C.P. Rule 23 (b)(1), (b)(2), and/or (b)(3), including appointment of Representative Plaintiffs' counsel as Class Counsel;

2. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

3. That the Court enjoin Defendant, ordering it to cease and desist from unlawful activities in further violation of California Business and Professions Code §17200, *et seq.*;

4.      For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Representative Plaintiffs' and Class Members' PII/PHI, and from refusing to issue prompt, complete, any accurate disclosures to Representative Plaintiffs and Class Members;

5.      For injunctive relief requested by Representative Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Representative Plaintiffs and Class Members and the general public, including but not limited to an Order:

a.      prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

b.      requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

c.      requiring Defendant to delete and purge the PII/PHI of Representative Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Representative Plaintiffs and Class Members;

d.      requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Representative Plaintiffs' and Class Members' PII/PHI;

e.      requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

f.      prohibiting Defendant from maintaining Representative Plaintiffs' and Class Members' PII/PHI on a cloud-based database;

g.      requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

h.      requiring Defendant to conduct regular database scanning and securing checks;

i.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII/PHI, as well as protecting the PII/PHI of Representative Plaintiffs and Class Members;

j.    Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

k.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

l.    requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendant's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated;

m.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

6.    For prejudgment interest on all amounts awarded, at the prevailing legal rate;

7.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

8.    For all other Orders, findings, and determinations identified and sought in this Complaint.

///

///

///

///

///

///

## JURY DEMAND

Representative Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury for all issues triable by jury

Dated: October 19, 2021                    Respectfully Submitted,

*/s/ Bibianne U. Fell*
Bibianne U. Fell (S.B. # 234194)
**FELL LAW, P.C.**
402 W. Broadway, Suite 950
San Diego, CA 92101
Telephone:   (858) 201-3960
Facsimile:(858) 201-3966

William B. Federman* (Oklahoma S.B. # 2853)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone:   (405) 235-1560
Facsimile:(405) 239-2112
wbf@federmanlaw.com

Scott Edward Cole, Esq. (S.B. #160744)
Cody Alexander Bolce, Esq. (S.B. #322725)
**COLE & VAN NOTE**
555 12th Street, Suite 1725
Oakland, California 94607
Telephone: (510) 891-9800
Facsimile: (510) 891-7030
Email:  sec@colevannote.com
Email:  cab@colevannote.com